```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
GORDON SPRINGS,                                                :
                                                               :
                                                               :
                                            Plaintiff,         :
                                                               :       OPINION & ORDER GRANTING
THE CITY OF NEW YORK, THE CITY OF                              :       MOTION TO DISMISS
NEW YORK FIRE DEPARTMENT, FIRE                                 :
COMMISSIONER DANIEL A. NIGRO, in his                           :       19 Civ. 11555 (AKH)
official and individual capacities, CAPTAIN                    :
VINCENT DISTEFANO, and FIREFIGHTER                             :
RICHARD DAVI,                                                  :
                                                               :
                                                               :
                                            Defendants.        :
                                                               :
-------------------------------------------------------------- X
```

ALVIN K. HELLERSTEIN, U.S.D.J.:

Plaintiff Gordon Springs, a New York City firefighter, filed this employment discrimination suit in December 2019, alleging that the above-named Defendants discriminated and retaliated against him on the basis of race, sex, national origin, and sexual orientation. *See* Compl., ECF No. 5; First Amended Compl., ECF No. 27 ("FAC"). In short, Springs claims that he was mistreated on account of his being African American and Muslim, and on account of his complaining that he was sexually harassed, in violation of Title VII of the Civil Rights Act of 1964, New York State Human Rights Law ("SHRL"), and New York City Human Rights Law ("CHRL"). Now before the Court is Defendant's unopposed[1] motion to dismiss the complaint for failure to state a claim. *See* Mtn. to Dismiss, ECF No. 22; Def. Mem., ECF No. 23. For the reasons that follow, Defendants' motion to dismiss is granted.

---

[1] As described *infra*, rather than file an opposition to Defendants' motion to dismiss, Plaintiff opted instead to file an amended complaint.

1

**I. Factual Background**

Except where otherwise stated, the following facts derive from the FAC and are assumed true for purposes of this motion, with ambiguities construed in the light most favorable to Springs as the nonmovant.

Springs became a firefighter with Defendant New York City Fire Department ("FDNY") in the spring of 2015. *See* FAC at ¶ 16. On January 20, 2017, Springs filed an action against the City of New York and members of the FDNY—members not named as Defendants in this action—claiming that he was sexually harassed and discriminated and retaliated against on the basis of race by firefighters at FDNY Ladder Companies 21 and 35. *See Springs v. City of New York, et al.*, 17 Civ. 451 (the "2017 Lawsuit"), ECF No. 1. All but one of the defendants in the 2017 Lawsuit moved for summary judgment and, on March 29, 2019, Judge Alison Nathan granted summary judgment on all but Springs's claim that he was retaliated against for his filing a complaint of sexual harassment in 2015 with the Equal Employment Opportunity Commission ("EEO") and Springs's claim that he was subjected to a hostile work environment. *See* Order, 17 Civ. 451, ECF No. 85. Springs later voluntarily dismissed a handful of his claims, *see* Order, 17 Civ. 451, ECF No. 133, and a trial on the remaining claims is set to take place in due course.

In December 2017, the FDNY detailed Springs to Firehouse Engine 67 ("Engine 67"), located in upper Manhattan. *See id*. at ¶¶ 9, 22.

A. Exchanging Tours

During his time at Engine 67, Springs "observed that a number of firefighters were exchanging tours with each other." *Id*. at ¶ 23. The practice of "exchanging tours," known also as a "mutual," is an arrangement whereby firefighters exchange schedules with one another, with such arrangements being negotiated between firefighters or negotiated between firefighters with the assistance and approval of an officer. *Id*. at ¶ 24. According to Springs, "Firefighters at Engine 67 willfully refused or deliberate [sic] ignored" his requests for mutuals. *Id*. at ¶ 25. For

2

example, when Springs arrived at Engine 67, he asked Defendant Captain Vincent DiStefano if "[Springs] would be able to do mutual with other firefighters," and while DiStefano told him that "after completing a few tours, [Distefano] would get firefighters to do mutuals" with Springs, he later "deliberately ignored … Springs' requests to perform mutual." *Id*. at ¶¶ 28-30.  And aside from DiStefano, "no firefighter would agree to do mutuals with … Springs." *Id*. at ¶ 31.

Springs alleges that "all firefighters and officers of Engine 67" were at all times "aware of the incident of alleged sexual harassment," which Springs alleged took place in spring of 2015 and was the focus of the 2017 Lawsuit, and were further aware of Springs's complaints with the EEO of "discrimination and retaliation" made in 2015.  *Id*. at ¶¶ 26-27.

B. Miscellaneous Grievances

The FAC refers to a number of other grievances, some of which also involve DisStefano.  To start, Springs alleges that, at an unspecified time, DiStefano called Springs into his office and asked Springs whether "the length of [his] hair" was consistent with the rules and regulations.[2]  *See id*. at ¶¶ 33-35.  However, Springs asserts, "his hairstyle … abided by all of the rules and regulations regarding hairstyles." *Id*. at ¶ 35.  The FAC notes also that "Springs is an African American male and his hair texture if [sic] different from many Caucasian firefighters," and that DiStefano asked no questions of another "Caucasian firefighter," who is a member of a different FDNY Ladder, and "who also has longer hair." *Id*. at ¶¶ 36-39.

From there, the FAC contends that: (1) despite several requests, Springs was not assigned a mailbox at Engine 67, while other new members of Engine 67 did receive mailboxes, *id*. at ¶¶ 40-41; (2) during his tenure at Engine 67, photographs of "all other firefighters" in that

---

[2] Springs does not say whether these "rules and regulations" are rules specific to a certain firehouse or whether they are rules promulgated by the FDNY.  Nor does Springs identify any rule or rules in particular that were referenced by DiStefano and/or followed by Springs.  Nor still does Springs state whether the aforementioned rules are binding or advisory.  *See* FAC at ¶¶ 34-35.

3

firehouse were "added to the wall," but no photograph of Springs was so added, *id.* at ¶¶ 42-45; and (3) Springs "was not provided with collar brass,"[3] which would have signaled that he was a member of Engine 67, whereas "similarly situated firefighters who were also newer members of Engine 67, were issued collar brass," *id.* at ¶¶ 46-47.

    C. Firehouse Meal Preparation

In February 2018, during a firehouse meal, certain firefighters in Engine 67 "made hamburgers in the same pan used to cook bacon (pork)." *Id.* at ¶ 48. Springs had, per the FAC, previously "advised all firefighters in the firehouse that he was unable to eat pork or cook with pork, due to his religious beliefs as a Muslim." *Id.* at ¶ 49. Nevertheless, the FAC alleges, the other firefighters of Engine 67 "purposefully cooked with pork and/or deliberately ignored" Springs's "religious restrictions." *Id.* at ¶ 50.

    D. The "Late" Arrival

In May 2018, Springs arrived at the Engine 67 firehouse at 8:40 a.m. to report for duty. Springs asserts that although he was not scheduled to begin work until 9:00 a.m., and was therefore 20 minutes early, DiStefano recorded in the "firehouse company journal" in "bright red ink" that Springs arrived at 8:40 a.m. (the FAC does not say, but the Court assumes that the use of "bright red ink" was meant to indicate by DiStefano that Springs had arrived at the incorrect time). *See id.* at ¶¶ 52-53. The FAC alleges that FDNY regulations provide for the day to start at the firehouse at 9:00 a.m., *id.* at ¶ 54, and that, in any case, no similarly situated firefighters were singled out "for arriving before their tour," *id.* at ¶ 55. Aside from DiStefano recording the time of Springs's arrival, the FAC does not allege that any negative consequences resulted from this incident.

    E. The T-Shirt Altercation

---

[3] "Collar brass" is "used as FDNY vernacular to describe a small metal pin, shaped as an FDNY badge, … inscribed with the number of the Engine … to which a firefighter is assigned." FAC at ¶ 46.

4

According to Springs, the "[u]nlawful aggression and hostility against [him] … came to a head in September of 2018." *Id*. at ¶ 57.  On September 4, 2018, Defendant Firefighter Davi[4] "verbally assaulted" Springs, accusing the latter of throwing a t-shirt that was "made as a memorial to a deceased firefighter" into the garbage.  Specifically, "Davi[] saw the t-shirt next to an area in the firehouse where the garbage was" and "exploded," and at no time "sought to have an interactive discussion with [Springs]." *Id.* at ¶¶ 58-62.  Springs alleges, however, that he did not throw the t-shirt into the garbage.  *Id*. at ¶¶ 60-61.

Hearing the commotion between Davi and Springs, DiStefano approached to intervene.  *See id*. at ¶ 63.  Springs claims that DiStefano did not try to "deescalate" and instead said to Springs: "You're a piece of shit.  You're fucked up … you went to a fucked-up firehouse and now you're fucked up."  *Id*. at ¶ 64.  DiStefano then advised Springs that he was relieved of duty and would be sent "back to the FDNY Counseling Services Unit (CSU)" for counseling.  *Id.* at ¶ 65.  Springs claims DiStefano said that (1) Springs should not have complained previously in what became the 2017 Lawsuit and (2) Springs should call his lawyer and the union because "No house is ever gonna accept you."  *Id*. at ¶¶ 66-67.

F. Aftermath of the T-Shirt Incident

Following the altercation with Davi, Springs was detailed in the Bronx at a different firehouse——this, despite DiStefano having told Springs that he would be returned to CSU for additional counseling.  *Id*. at ¶ 68.  Springs inquired with his superiors as to why he was the one being transferred, as opposed to Davi, and was informed by FDNY personnel that he was being transferred "for his 'safety.'"  *Id*.

Two days after the t-shirt incident, despite Springs's willingness to return to "full duty," the FDNY "ordered [him] to *light duty* assignment."  *Id*. at ¶ 71 (emphasis added).  Per the

---

[4] The FAC does not say whether "Davi" is a first name or last name, and simply refers to this individual as "Davi."

5

FAC, a "light duty position … usual [sic] consists of menial tasks and administrative duties" and is "considered a punishment." *Id*. at ¶¶ 72-73.  Around this same time, Springs filed an internal complaint with the FDNY's Equal Employment Office.[5]  *Id*. at ¶ 71.

Following the t-shirt incident and the filing of his internal complaint, Springs went on medical leave.  *Id*. at ¶ 74.

G. Return to Duty

In late January 2019, Springs returned to duty.[6]  *See id*. at ¶ 75.  Upon his return, he was assigned to light duty.  *Id*.  The FAC states that light duty assignments detract from one's ability to receive training opportunities, overtime pay, a flexible work schedule, and promotions. *See id*. at ¶¶ 75, 82.  Although not expressly stated, the FAC suggests that Springs is presently an active employee of the FDNY, working on light duty.  *Cf. id*. at ¶ 83.

H. The Disability Application

In August 2019, the FDNY filed a "disability application" and "it was determined that [Springs] was unfit for fire duty with a diagnosis of psychological axis disorder."[7]  *See id*. at ¶ 76.  That November, the New York City Fire Pension Fund concluded that Springs was, in fact, "not permanently disabled," and recommended that the FDNY's disability application be denied. *Id*. at ¶ 77.  Springs states that, as part of the Pension Fund's finding that he was not disabled, his personal doctor, Dr. Kelly, and another doctor "cleared [him] for full duty."  *Id*. at ¶ 78.

---

[5] The FAC says that this internal complaint was made regarding "the above incidents and more," but it is not clear whether Springs is referring just to the t-shirt incident, or to the entire preceding portion of the FAC.

[6] The FAC states that Springs returned in January 2019 on "full duty," FAC at ¶ 75, but this is in tension with the nearby paragraphs of the FAC detailing the FDNY's determination that he would return on "light duty," *id*. at ¶ 80, discussed in section I.H, and the fact that the FAC says that Springs "was supposed to *return* to full duty on or about December 16, 2019," *id.* at ¶ 79 (emphasis added), indicating that he was previously not on full duty.  As best the Court can make sense of it, it seems that Springs is attempting to say that because he was unaware that he had been deemed unfit by the FDNY for full duty, he *thought* he was returning to full duty and was instead greeted by light duty assignments.  *See* section I.H, *infra*.  In any case, whether Springs returned to full duty and was asked to work on light duty assignments or returned to light duty outright is irrelevant for purposes of resolving this motion.

[7] The FAC does not explain what this ailment entails.

6

Ultimately, the FDNY's "Chief Medical Physician … overturned the decision" of the Pension Fund, and "ordered [Springs] back to light duty." *Id*. at ¶ 80. According to Springs, he was not made aware of the FDNY's disability application or of the determination that he was unfit for duty until some unspecified time after his January 2019 return. *See id*. at ¶¶ 76, 81.

## II. Procedural History

Springs received a "Right to Sue" letter from the EEOC on September 18, 2019, and commenced this lawsuit 91 days later, on December 18, 2019. *See* Compl. at ¶ 14. Springs filed the FAC on June 15, 2020, contending that Defendants discriminated against him due to his race, sexual orientation, sex,[8] and religion, and retaliated against him for his earlier complaints of sexual harassment, in violation of Title VII, CHRL, and SHRL. FAC at ¶¶ 93-122.

Between the filing of the original complaint and the FAC, Defendants filed this motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See* Mtn. to Dismiss. As was noted *infra*, Springs did not file an opposition brief. Instead, Springs filed the FAC, which adds, principally, a handful of paragraphs alleging DiStefano's questioning of Springs's hair, described in section I.B, *supra*. Rather than denying Defendants' motion to dismiss as moot, I exercise my discretion to consider the merits of the motion in light of the amended pleadings. *See*, *e.g.*, *Haag v. MVP Health Care*, 866 F.Supp.2d 137, 140 (N.D.N.Y. 2012).

## III. Discussion

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "accept as true all of the factual allegations contained in the complaint," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007), draw "all inferences in the light most favorable to

---

[8] Although the FAC repeatedly asserts that Springs was discriminated against on the basis of his "sex" and "sexual orientation," nowhere does the FAC actually allege any adverse action that has any plausible connection to his sex or sexual orientation. As such, for the avoidance of conclusion, I note that the remainder of this order deals only with Springs's remaining claims: that he was discriminated and retaliated against on the basis of his race, religion, and previous complaints of sexual harassment.

7

the non-moving party's favor," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007), and determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). When the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation marks omitted). Allegations that permit the inference of no more than the "mere possibility of misconduct" are insufficient to withstand dismissal. *Id*. at 679.

While a plaintiff "alleging employment discrimination or retaliation is not required to plead facts sufficient to establish a *prima facie* case," the complaint must nonetheless incorporate "sufficient factual heft to show that the pleader is entitled to relief." *Zabar v. City of New York Dep't of Educ.*, No. 18 Civ. 6657, 2020 WL 2423450, at *6 (S.D.N.Y. May 12, 2020) (quotation marks omitted) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). And even under *Swierkiewicz*, the factual allegations "'must be enough to raise a right of relief above the speculative level.'" *Id*. (quoting *Twombly*, 550 U.S. at 555); *De La Pena v. Metro Life Ins. Co.*, 953 F.Supp.2d 393, 401 (E.D.N.Y. 2013) ("[A] plaintiff must still at a minimum establish those facts necessary to establish liability on the part of the employer, that is, there must be sufficient facts to draw a plausible inference that the plaintiff can satisfy their *prima facie* case."), *aff'd*, 552 F. App'x 98 (2d Cir. 2014).

A. Retaliation

In order to make out a case of retaliation under either Title VII or SHRL, the complaint must plausibly allege: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quotation marks omitted). Under CHRL, which requires a separate analysis, *see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir.

8

2013), plaintiffs must plausibly allege facts capable of supporting the same *prima facie* case as is required by both Title VII and the SHRL, "except that the plaintiff need not prove any adverse employment action; instead, she must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity," *Benziger v. Lukoil Pan Americas, LLC*, --- F.3d ---, 2020 WL 1322478, at *20 (S.D.N.Y. Mar. 20, 2020) (quotation marks and alterations omitted).

Defendants argue that Springs has failed to adequately plead to either the third or fourth elements of a *prima facie* case.  *See* Def. Mem. at 5-9.  I agree that Springs has fallen well short of pleading facts that allow for the plausible inference that Springs can satisfy the fourth element (causation).

The FAC, read in the light most favorable to Springs, identifies the following as alleged adverse actions: (1) Springs was not given a mailbox at Engine 67; (2) other firefighters in Engine 67 would not swap shifts with Springs; (3) no photograph of Springs was ever placed on the wall of Engine 67; (4) unnamed firefighters of Engine 67 cooked hamburgers and pork in a communal pan, despite knowing Springs abstained from eating pork for religious reasons; (5) Springs was yelled at by Davi because Davi believed that Springs had thrown a t-shirt made as a memorial to a deceased firefighter into the trash; (6) DiStefano questioned Springs regarding the length of Springs's hair; (7) DiStefano singled out Springs for arriving early; and (8) Springs was placed on light duty, rather than full duty, after he was diagnosed with a psychological disorder. While Springs does not specify, the FAC seems to allege that Springs was retaliated against for (1) his 2015 EEOC complaint, and (2) his filing the January 2017 Lawsuit, with the above-described actions, which took place throughout the period from late 2017 to 2019.

Springs at most raises the specter of the "mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  To start, I note that nowhere in the FAC does Springs ever state anything to the effect of, "Defendant X committed Act Y in retaliation for Springs filing an EEOC complaint or

9

the 2017 Lawsuit." Instead, Springs simply says that all firefighters at Engine 67 were "aware" of these complaints at "all times material." FAC at ¶¶ 26-27. So, in a literal sense, Springs has failed to allege that he was retaliated against. *Cf. Zabar*, 2020 WL 2423450, at *11 ("[R]ather than alleging causality, Plaintiff merely recounts the timing of these actions.").

But even delving further into the weeds of each alleged adverse action, the FAC cannot be contorted into a shape that properly pleads causation. First, the FAC does not name any decisionmaker responsible for not providing Springs with a mailbox, for not placing a photo of him on the wall, or for not providing him with a "small metal pin." Absent a decisionmaker, it is impossible to know whether that decisionmaker was acting out of retaliatory animus or instead these were, for instance, administrative oversights.

Second, and far more glaringly, the sole link between the 2015 complaint and 2017 Lawsuit and later acts of alleged retaliation, from late 2017 to 2019, appears to be that the latter chronologically followed the former. True, retaliatory animus can be shown by indirect evidence that the "protected activity was followed closely by retaliatory action." *Sclafani v. PC Richard & Son*, 668 F.Supp.2d 423, 436 (E.D.N.Y. 2009). However, courts in this Circuit "have consistently held that a passage of *more than two months* between the protected activity and the adverse employment action does not allow for an inference of causation." *Benziger*, 2020 WL 1322478, at *16 (quotation marks and alterations omitted) (emphasis added); *id*. (noting that the "Supreme Court has suggested that the temporal proximity 'must be very close'") (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, (2001)); *cf. also Zabar*, 2020 WL 2423450, at *6 (dismissing discrimination claims at the 12(b)(6) stage and reasoning that, "While the Amended Complaint provides a chronology of alleged adverse actions, it does not plead facts linking [the protected trait] to the alleged adverse actions.").

Here, the latest protected act occurred in January of 2017 with the filing of the 2017 Lawsuit—Springs did not even begin work at Engine 67, an entirely different firehouse

10

from that involved in the earlier incidents, until the middle of December 2017, nearly a full year later.  And certain of the alleged adverse acts, *e.g.*, the FDNY filing the disability application, did not occur until August of 2019, over two-and-one-half years after the filing of the 2017 Lawsuit.  *See Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (upholding dismissal at the 12(b)(6) stage, and noting that the "time lapses between [the]  protected activities and the alleged retaliatory acts—–ranging from two months to several years—–were simply too attenuated to establish that the alleged adverse employment actions were the product of a retaliatory motive absent other supporting factual allegations.").  In short, temporal proximity alone cannot do the work Springs needs it to.

Third, and relatedly, the FAC is replete with allegations that *other*, that is, *non-retaliatory*, motives caused several of the acts that Springs complains of.  For example, Springs himself states that Davi yelled at him—–in what Springs describes as the climax of his case, *see* FAC at ¶ 57 (alleging the incident with Davi is when the "aggression and hostility … came to a head")—–because he thought that Springs had thrown a t-shirt made for a deceased firefighter into the garbage.  *See* FAC at ¶¶ 58-62.  And insofar as the FAC may be taken to suggest that it was a separate adverse act for DiStefano to yell at Springs during the t-shirt kerfuffle, that claim meets the same fate because the FAC itself states that DiStefano intervened because he heard the commotion, not for some other discriminatory reason.  *See id*. at ¶ 63.[9]  As yet another example, Springs himself acknowledges that the FDNY placed him on light duty after he was "diagnos[ed with] psychological axis disorder."  *See id*. at ¶¶ 76-80.

---

[9] DiStefano telling Springs he was "fucked up" may not have earned DiStefano high marks for diplomacy, but this off-color remark was untethered from any discernible animus and was plainly made, per the FAC, in response to the (perhaps misinformed) view that Springs had thrown a memorial to a dead firefighter in the trash.  This stray insult is all the more incapable of sustaining Springs's claims in light of the fact that the FAC does not attempt to link this comment with any negative consequence whatsoever.  That DiStefano accused Springs of being "fucked up" due to his experience at a prior firehouse (presumably the firehouse at which Springs claims he was discriminated against) also changes nothing—DiStefano referred to the previous firehouse only to explain DiStefano's view as to what may have led Springs to the "fucked up" behavior of throwing the t-shirt in the garbage.

11

In sum, the FAC fails to adequately plead causation, dooming Springs's claims of retaliation under Title VII, SHRL, and CHRL.

B. <u>Hostile Work Environment</u>

To state a claim for a hostile work environment under Title VII or SHRL, the plaintiff must allege "that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of … employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quotation marks omitted); *Hall v. New York City Dep't of Transp.*, 701 F.Supp.2d 318, 328 (E.D.N.Y. 2010). The "incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Littlejohn*, 795 F.3d at 321 (quotation marks omitted). It is also "axiomatic that in order to establish" a "hostile work environment" under Title VII or SHRL, a "plaintiff must demonstrate that the conduct occurred *because of*" a protected trait. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quotation marks omitted) (emphasis added).

Under the CHRL, a "plaintiff need not establish that the conduct was severe or pervasive, only that she has been treated less well than other employees because of" a protected characteristic. *Russo v. New York Presbyterian Hosp.*, 972 F.Supp.2d 429, 450 (E.D.N.Y. 2013) (quotation marks omitted). Even under this "more liberal standard," a plaintiff must still show that the unequal treatment was "at least in part for discriminatory reasons." *Bright v. Coca-Cola Refreshments USA, Inc.*, No. 12 Civ. 234, 2014 WL 5587349, at *2 (E.D.N.Y. Nov. 3, 2014), *aff'd sub nom.*, 639 F. App'x 6 (2d Cir. 2015); *see also, e.g., Zabar*, 2020 WL 2423450, at *11 ("[E]ven under this minimal [CHRL] standard, a plaintiff must plausibly allege that … she was subjected to unequal treatment *because of* her protected characteristic.") (quotation marks omitted) (emphasis added). A CHRL claim should be therefore be dismissed "if the plaintiff does not allege behavior by the defendant that cannot be said to fall within the broad range of

12

conduct that falls between severe and pervasive on the one hand and a petty slight or trivial inconvenience on the other," *id*. (quotation marks omitted), or if the plaintiff fails to meet her "burden of showing that the conduct is caused by a discriminatory motive," *Isbell v. City of New York*, 316 F.Supp.3d 571, 593 (S.D.N.Y. 2018); *accord Dillon v. Ned Mgmt., Inc.*, 85 F.Supp.3d 639, 657 (E.D.N.Y. 2015) ("Plaintiff nonetheless has the burden of showing that the … conduct complained of was caused by a discriminatory motive.").

Springs fails to adequately plead a hostile work environment, because the FAC does not sufficiently claim a causal connection between Springs's protected characteristics and most of the contested acts and, as to the remaining acts, the alleged acts of hostility do not rise above the level of "petty slight or trivial inconvenience."

To begin with, the several alleged acts that Springs suggests were retaliatory for his complaining of discrimination rather than discriminatory on the basis of a protected trait–––coworkers being unwilling to swap shifts; the FDNY placing him on light duty; and Davi yelling at him–––lack any causal connection with protected conduct for the reasons already explained in section III.A, *infra*. *See*, *e.g.*, *Bacchus v. New York City Dep't of Educ.*, 137 F.Supp.3d 214, 244 (E.D.N.Y. 2014) ("Bacchus's … hostile work environment claim fails for the same reason as her … retaliation claims fail, *i.e.*, an insufficient showing as to causation.").

Of the remaining acts, only two have a borderline colorable link to a protected trait: DiStefano questioning Springs about his hair; and unnamed members of Engine 67 cooking pork. Two others–––Springs not being provided with a mailbox or getting his photo placed on the Engine 67 wall–––rely solely on the claim that a Caucasian member of Engine 67 received a mailbox and had his photo placed on the wall. *See* FAC at ¶¶ 40-45. This is too thin a reed upon which to build a plausible causal chain. *See De La Pena,* 953 F.Supp.2d at 418 (E.D.N.Y. 2013) ("Plaintiff's allegations that he was forced to return to work from disability leave while another Caucasian worker was allowed to remain on such leave … does not create a plausible inference

that the Defendant's actions were premised on [his] protected status.  Without more knowledge about how similarly situated these respective employees were, no such inference can plausibly be drawn here."); *see also id*. at 414 ("[W]ithout additional background facts to shed light on the racial composition of the other employees in the office and why they were [allegedly] not treated like the Plaintiff, this Court cannot plausibly infer that [he] was targeted because of his race/color and/or nation[al] origin."); *cf. Zabar,* WL 2423450, at *6 ("The absence of factual allegations providing a causal nexus between Plaintiff's [protected trait] and the alleged adverse actions is fatal to Plaintiff's hostile work environment claim."); *Nieblas-Love v. New York City Hous. Auth.*, 165 F.Supp.3d 51, 68 (S.D.N.Y. 2016) (dismissing CHRL claim where plaintiff "offer[ed] nothing but bare speculation to link [the uneqal treatment] to any discriminatory (or retaliatory) motive or intent").  Indeed, the FAC fails even to provide any contextual basis for inferring discrimination.  *Compare*, *e.g.*, *Isbell*, 316 F.Supp.3d at 590 (claims survived the 12(b)(6) stage where plaintiff alleged, *inter alia*, that they had all been transferred to "less prestigious unit[s]" and "replaced by non-African American individuals") (quotation marks omitted).

And as to the only act not yet mentioned—–DiStefano marking down Springs for arriving early—–the FAC contains *no* allegation connecting this act to a protected trait, and lacks any indication that the singling out was meaningfully negative, much less punitive.  *Cf.*, *e.g.*, *De La Pena*, 953 F.Supp.2d at 401 (describing a claim of being singled out as worthy of dismissal where "there were no allegations to suggest that the [act] … constituted ridicule or insult").  As we have seen, Springs cannot rely *solely* on the fact that he is African American or Muslim to convert any and all slights into discriminatory conduct.  *Compare id.* at 413 (dismissing under 12(b)(6) where plaintiff alleged that he "was the only Filipino in his office," that his manager made a "stereotype [about Filipinos] which may have had negative connotations," and that he was treated less well than "his coworkers" including a "Caucasian employee," and noting this was "not sufficient to connect the Defendants' actions … to a discriminatory intent.").

This leaves only DiStefano's questioning of Springs's hair and the pork-cooking incident. Both are classic examples of petty slights or trivial inconveniences. The FAC alleges that DiStefano "questioned [Springs] about the length of [his] hair," and that Springs responded by explaining that his hair was "more difficult to maintain because of the texture." Springs then goes on to allege that his "hair texture if [sic] different from many Caucasian firefighters." FAC at ¶¶ 34-38. The FAC does not allege that Springs made DiStefano aware that this difference in hair texture was due to his race. But, in any case, the allegations of DiStefano's questioning—— absent from the first iteration of Springs's complaint——never lead to *any* negative consequence. It seems that at most DiStefano asked a question regarding Springs's hair, which Springs acknowledges was "difficult to maintain," that was insensitive to the fact that Springs has a different texture than that of his Caucasian colleagues. This cannot surmount even the CHRL's permissive bar. *See*, *e.g.*, *Isbell*, 316 F.Supp.3d at 593 ("'[D]istrict courts must be mindful that the NYCHRL is not a general civility code.'") (quoting *Mihalik*, 715 F.3d at 110).

The alleged pork incident is equally if not more trivial. The full extent of that allegation is that unidentified firefighters in Engine 67 "cooked a meal and made hamburgers in the same pan used to cook bacon" even though they had "full knowledge" that Springs is Muslim and therefore "unable to eat pork or cook with pork." FAC at ¶¶ 48-50. That's it. Springs does not say whether this was the only pan in Engine 67; whether any firefighters made comments to accompany their cooking with pork suggestive of animus; whether Springs, in the moment, said anything to his coworkers to remind them of his dietary restrictions, *see id.* at ¶ 49 (noting that Springs had advised "all firefighters" that he was Muslim "*[p]rior to* this meal") (emphasis added); or even whether Springs was present at the time the cooking took place. But even stretching to its limit the duty to read the FAC in the light that is most favorable to Springs, it seems that at worst he would have been required to clean this pan in order to cook in it himself, or perhaps would have been required to notify a superior in Engine 67 that, in the future, his

15

meals would need to be prepared separately. Again, this incident may have been insensitive, but it did not impose anything more than a petty slight or inconvenience.

In sum, Springs's hostile work environment claims under Title VII, SHRL, and CHRL are all dismissed, as the FAC fails to plausibly plead that the complained-of acts occurred as a result of a protected characteristic or else fails to plead any acts that amounted to more than a petty slight or trivial inconvenience.

C. Other Claims and Arguments

Springs also brings standalone claims for discrimination and for aiding and abetting discriminatory conduct. *See* FAC at ¶¶ 93-123. These claims must be dismissed for the same deficiencies outlined *supra*, namely failure to plead facts that plausibly support causality or to plead facts that rise to the requisite level of severity or—as to aiding and abetting—to plead an underlying violation.

Finally, Defendants contend that Springs's Title VII claims are untimely. I agree that this provides an additional basis for dismissing the Title VII claims. As has been explained by other courts in this district:

> To be timely, actions for violations of Title VII must be filed within ninety days after receipt of a right to sue letter from the EEOC. *See* 42 U.S.C. § 2000e-5(f)(1) …. As the Second Circuit has held, "in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day." *Johnson v. Al Tech Specialties Steel Corp.*, 731 F.2d 143, 146 (2d Cir. 1984) (dismissing action filed ninety-seven days after receipt); *see Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 78 (2d Cir. 2003) (affirming dismissal of a complaint received by *pro se* office ninety-two days after receipt of right to sue notice); *Moscowitz v. Brown*, 850 F.Supp.1185, 1191 (S.D.N.Y. 1994) (dismissing *pro se* action filed ninety-one days after receipt of notice).

*Jones v. City Sch. Dist. of New Rochelle*, 695 F.Supp.2d 136, 142 (S.D.N.Y. 2010) (Chin, *J.*). Per to the FAC, Springs received the EEOC's Right to Sue letter on "September 18, 2019." FAC at ¶ 14. Springs therefore had until December 17, 2019 to file his complaint. He did not do so, despite being represented by counsel, until December 18, 2019. *See* Compl. Springs has pointed

16

to no "equitable consideration" that warrants relaxation of the limitations period,[10] and I find that untimeliness provides another reason to dismiss his Title VII claims.

\* \* \*

In certain circumstances it would be prudent as a discretionary matter to permit Springs to amend his pleadings and build his case, *see Alfano*, 294 F.3d at 377. But here, where Springs responded to Defendants' motion to dismiss for failure to state claim with an amended complaint that fails to correct any of the shortcomings identified in Defendants' motion, I find that further amendment is futile and that dismissal with prejudice is proper. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss.").

## Conclusion

For the foregoing reasons, the FAC is dismissed with prejudice. That Springs had a chance to amend and failed to correct the deficiencies of his initial complaint makes clear that allowing repleading is not a wise option. The Clerk is hereby instructed to close the open motion (ECF No. 22) and mark the case closed.

SO ORDERED.

Dated:    June 26, 2020                       _____/s/_____
         New York, New York                       ALVIN K. HELLERSTEIN
                                                  United States District Judge

---

[10] Indeed, as noted *supra*, Springs chose not to respond *at all* to the untimeliness argument, instead repeating in the FAC the timeline that gave rise to Defendants' argument. *See*, *e.g.*, *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("A plaintiff abandons a claim where he raises it in the complaint but remains silent on the issue elsewhere in the record.").